## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEST SHORT HOME, LLC f/k/a** | : | **CIVIL ACTION NO. 1:22-CV-499** |
| **WEST SHORE WINDOW & DOOR,** | : | |
| **INC.,** | : | **(Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL BRETT GRAESER,** | : | |
| **JOSHUA PENN, and P.J.** | : | |
| **FITZPATRICK, LLC,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff West Shore Home, LLC ("West Shore"), brings this action against its former employees, defendants Michael Graeser and Joshua Penn, and their current employer, defendant P.J. Fitzpatrick, LLC ("Fitzpatrick"), for misappropriation of trade secrets in violation of state and federal law, and related state-law claims. Defendants move to dismiss West Shore's amended complaint on different grounds. Graeser seeks to compel arbitration. Fitzpatrick and Penn both argue West Short has failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Penn also suggests the court lacks subject matter jurisdiction under Rule 12(b)(1). We will grant Penn's motion to dismiss for want of jurisdiction and deny Graeser's and Fitzpatrick's motions.

I.      **Factual Background & Procedural History**

A.      **West Shore's Business**

West Shore is a privately held home-remodeling company specializing in windows, doors, and bathroom renovation.  (See Doc. 9 ¶¶ 1-2).  It has approximately 30 locations in 15 states and is headquartered in Mechanicsburg, Pennsylvania.  (See id. ¶ 1).  Fitzpatrick is West Shore's direct competitor.  (See id. ¶ 16).  The home-remodeling industry is a highly competitive market with many companies vying for scarce resources.  (See id. ¶ 15).  That competition has only intensified since the COVID-19 pandemic hampered global supply chains.  (See id.) West Shore and Fitzpatrick offer similar services and prices, and their service areas overlap in parts of Pennsylvania, New Jersey, and Maryland.  (See id. ¶¶ 16-17). Given the similarities between their businesses, both companies sell some of the same products and compete for the same vendors, materials, and skilled laborers. (See id. ¶¶ 18-19).

West Shore "invested substantial time, effort, and money" in acquiring and developing "Confidential Information and Trade Secrets."  (See id. ¶ 116).  Although the company "shares information generally regarding its aggressive growth strategy," it does not divulge details about vendors, materials costs, utilization methods, or procurement strategies, all of which it designates as confidential.  (See id. ¶ 14).  West Shore maintains its confidential information electronically and limits access to it internally to certain employees on a need-to-know basis.  (See id. ¶ 115). Designated employees may only access confidential materials with a password; they are prohibited from downloading them to personal devices or forwarding them to

personal or third-party email addresses.  (See id.)  West Shore also utilizes

nonsolicitation and nondisclosure agreements to further protect its confidential

information and trade secrets from third parties.  (See id.)  The company requires

all employees to review the company's handbook and acknowledge its

confidentiality rules on a yearly basis.  (See id.)

**B.**     **Graeser's Employment with West Shore**

West Shore hired Graeser on or about September 17, 2018.  (See id. ¶ 20).

Five months later, on February 12, 2019, Graeser executed an employment

agreement with West Shore "in consideration of their mutual promises hereinafter

set forth and other good and valuable consideration, the receipt and sufficiency of

which are hereby mutually acknowledged."  (See Doc. 9-1 at 1).  The agreement

contains nonsolicitation and confidentiality provisions.  (See Doc. 9 ¶ 23).  Graeser

agreed not to disclose any confidential information or trade secrets both during and

after the term of his employment; he also pledged to return any information in his

possession to West Shore upon expiration or termination of the agreement.  (See id.

¶ 24; see also Doc. 9-1 at 2-3).

To avoid potentially irreparable harm from the "disclosure or alteration" of

confidential information, the agreement expressly authorizes West Shore to "seek

and obtain injunctive relief against the breach or threatened breach of" the

confidentiality provisions, "in addition to any other legal remedies that may be

available."  (See Doc. 9-1 at 3).  The parties also agreed "[a]ny claim may, at the

option of either [West Shore] or [Graeser], be adjudicated by final and binding

arbitration."  (See id. at 6).  The arbitration portion of the agreement concludes:

**BOTH COMPANY AND EMPLOYEE ARE HEREBY AGREEING TO CHOOSE ARBITRATION, RATHER THAN LITIGATION OR SOME OTHER MEANS OF DISPUTE RESOLUTION, TO ADDRESS THEIR GRIEVANCES OR ALLEGED GRIEVANCES WITH THE EXPECTATION THAT THIS RESOLUTION PROCESS MAY BE MORE COST-EFFECTIVE AND EXPEDIENT FOR THE PARTIES THAN LITIGATION.  BY ENTERING INTO THIS AGREEMENT AND THE ARBITRATION PROVISIONS OF THIS SECTION, BOTH PARTIES ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY, AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION, OTHER THAN AS SET FORTH IMMEDIATELY BELOW.**

**THE PARTIES AGREE THAT DUE TO THE POSSIBLE IMMEDIATE AND IRREPARABLE HARM FROM A VIOLATION OF THE RESTRICTIVE COVENANT SECTIONS OF THIS AGREEMENT, THESE ARBITRATION REQUIREMENTS SHALL NOT APPLY TO ANY NON-SOLICITATION OR NON-DISCLOSURE PROVISIONS, RIGHTS, AND LEGAL REMEDIES CONTAINED ELSEWHERE IN THIS AGREEMENT.**

(See id. at 6-7 (emphasis in original)).

Graeser served as West Shore's procurement manager, a high-ranking position responsible for overseeing the sourcing of materials for the company's installation projects throughout its service network.  (See Doc. 9 ¶ 21).  He had access to "valuable, confidential, proprietary and/or trade secret information" by virtue of his position, including vendor information and capacities, strategies for sourcing materials and supply chain optimization, purchasing trends, pricing information for materials, locations for and stock of company remodeling materials, material utilization rates, market research, and expansion plans and strategies.

(See id. ¶ 22).  Graeser resigned from West Shore on November 24, 2021.  (See id. ¶ 26).  He told several West Shore employees he was going to work for Masonite, a door manufacturer and distributor, but in fact he became Fitzpatrick's director of procurement and inventory management.  (See id. ¶¶ 26, 37).

In early 2022, West Shore discovered Graeser had forwarded three emails containing the company's confidential information and trade secrets from his work email address to personal email accounts a few weeks before he quit.  (See id. ¶ 38).  On October 8, 2021, Graeser forwarded "a strategic Warehouse Distribution Plan" that West Shore commissioned from a third-party.  (See id. ¶¶ 39-40).  The plan relied upon "highly confidential and proprietary information" and was intended to guide West Shore's efforts to optimize its performance and growth strategies.  (See id. ¶¶ 40, 43).  The creator listed then-current locations of West Shore's product warehouses and distribution centers with accompanying notations describing the measurements and square footage needed to successfully operate each location.  (See id. ¶ 41).  The plan also identified target locations for new warehouses and distribution centers.  (See id. ¶ 42).  On October 21, Graeser forwarded an email to a personal address belonging to his wife and attached a spreadsheet detailing the tool list for West Shore's installation trucks.  (See id. ¶ 44).  The spreadsheet identified product numbers, costs, and quantities for all tools maintained in the company's truck fleet.  (See id. ¶ 45).  Graeser forwarded a third and final email, this one containing confidential pricing information from one of West Shore's vendors, on November 17, just one week before his resignation.  (See id. ¶ 46).  West Shore avers Graeser forwarded the three emails for Fitzpatrick's benefit.  (See id. ¶ 48).

A West Shore vendor attempted to email Graeser on January 4, 2022, but inadvertently used his old work address, which the company still maintained.  (See id. ¶ 49).  The January 4 email chain contained references by Graeser to "historical data" and "sales trends" related to consumer preferences and confidential information about specific vendors' capabilities—information West Shore asserts he only could have learned through his previous employment.  (See id. ¶¶ 50-52, 54).  Graeser also mentioned having Fitzpatrick develop strategic purchasing methods, with direct references to West Shore's methods.  (See id. ¶ 53).

West Shore sent Graeser a cease-and-desist letter upon discovering his emails and asked him to preserve all documents and communications he may have shared with Fitzpatrick and its vendors or suppliers.  (See id. ¶¶ 55-56; see also Doc. 9-3).  Graeser replied he "destroyed (deleted) the documents" identified in West Shore's letter and would honor his employment agreement.  (See Doc. 9 ¶¶ 57-58 (quoting Doc. 9-4)).  West Shore sent a similar letter to Fitzpatrick.  (See id. ¶ 59 (citing Doc. 9-5)).  Fitzpatrick continued to use or disclose the information Graeser gleaned from his time at West Shore notwithstanding the letter's demands.  (See id. ¶¶ 60, 64).  In March 2022, a vendor who supplied both companies notified West Shore it would no longer supply the company's branches.  (See id. ¶¶ 61-62).  West Shore had to pay more to procure the same materials elsewhere.  (See id. ¶ 63).

### C.    Penn's Employment with West Shore

West Shore hired Penn in April 2019 as a lead installer, a position that oversees the company's home renovation projects and supervises less-experienced installers on job sites.  (See id. ¶¶ 27, 31).  West Shore fired Penn in June 2021 due to

an undisclosed "policy violation," but rehired him less than two weeks later. (See id. ¶¶ 28-29). Penn executed an employment agreement upon being rehired that included confidentiality requirements as well as a provision prohibiting him from soliciting West Shore's employees during a 24-month "restricted period" following his termination. (See id. ¶¶ 33-35; see also Doc. 9-2). Penn had access to confidential information consisting of employees' names, contact information, and capabilities; customer contracts and contact information; installation policies and procedures; and training programs and materials. (See Doc. 9 ¶ 32).

West Shore fired Penn for "yet another policy violation" in January 2022. (See id. ¶ 30). Penn then went to work for Fitzpatrick as a lead bath installer. (See id. ¶ 66). On March 15, 2022, West Shore learned Penn solicited 16 of its employees to come work for Fitzpatrick. (See id. ¶¶ 67, 69). Penn did so by texting the group a picture of himself in Fitzpatrick attire with the message: "Come join the team." (See id. ¶ 68 (citing Doc. 9-6)). West Shore sent Fitzpatrick and Penn cease-and-desist letters after discovering the text messages. (See id. ¶¶ 75-77).

### D. Procedural History

West Shore filed suit against Graeser and Fitzpatrick in the Court of Common Pleas of Cumberland County on March 4, 2022, and defendants timely removed to this court. West Shore subsequently filed an amended complaint adding Penn as a defendant. All defendants have moved to dismiss the complaint, each on different grounds. The motions are fully briefed and ripe for disposition.

## II.   **Legal Standards**

### A.   **Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.  See FED. R. CIV. P. 12(b)(1).  Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction.  Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's burden to establish jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  When a defendant raises a facial challenge to the court's exercise of supplemental jurisdiction, we must consider the allegations and documents referenced in and attached to the complaint in the light most favorable to the plaintiff.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).  "A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'"  Id. at 178 (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

### B.   **Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.

8

See FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim

for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### C.    Motions to Compel Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, requires district courts to refer for arbitration any issue covered by an enforceable arbitration agreement and to dismiss a case when one of the parties seeks a stay pending arbitration. See Lloyd v. Hovensa, LLC, 369 F.3d 263, 269 (3d Cir. 2004) (citing 9 U.S.C. § 3). A court may rely upon either the standards governing motions to dismiss under Rule 12(b)(6) or those governing summary judgment motions under Rule 56 when resolving a motion to compel arbitration. See Guidotti v. Legal Helpers Debt Resolution LLC, 716 F.3d 764, 771-76 (3d Cir. 2013); see also GGNSC Camp Hill W. Shore, LP v. Thompson ex rel. Mullen, No. 1:15-CV-445, 2015 WL 1932330, at *7 (M.D. Pa. Apr. 28, 2015) (Conner, C.J.). In Guidotti, our court of appeals offered guidance for determining the appropriate standard given the varying circumstances and procedural postures in which such cases arise:

> [W]hen it is apparent, based on the face of the complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.
>
> But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to

> arbitrate in issue, then the parties should be entitled to
> discovery on the question of arbitrability before a court
> entertains further briefing on the question.

Guidotti, 716 F.3d at 776 (internal citations and quotation marks omitted) (quoting

Somerset Consulting, LLC v. United Cap. Lenders, LLC, 832 F. Supp. 2d 474, 482

(E.D. Pa. 2011)).  West Shore and Graeser agree Graeser's motion should be decided

under the Rule 12(b)(6) standard.  (See Doc. 11 at 6; Doc. 17 at 12).

## III.   Discussion

### A.    Graeser's Motion to Compel Arbitration

West Shore alleges Graeser violated his employment agreement by disclosing

its confidential information and trade secrets (Count I), unlawfully converted the

same for his own benefit (Count II), and breached his duty of loyalty in doing so

(Count III).  (See Doc. 9 ¶¶ 78-103).  West Short also claims Graeser and Fitzpatrick

misappropriated its trade secrets in violation of state and federal law (Counts V and

VI, respectively).  (See Doc. 9 ¶¶ 111-151).  Graeser contends these claims should be

dismissed because they are subject to arbitration.  (See Doc. 11 at 3-7).  He argues in

the alternative the restrictive covenants to which he agreed five months into his

tenure with West Shore are unenforceable for lack of consideration.  (See id. at 7-8).

#### 1.    *Arbitration*

The FAA provides a framework for enforcing private arbitration agreements.

See Sandvik AB v. Advent Int'l Corp, 220 F.3d 99, 104 (3d Cir. 2000).  A court must

address two issues when adjudicating a motion to compel arbitration: (1) whether

the parties have entered into a valid written agreement to arbitrate, and (2) whether

the dispute in question falls within the scope of that agreement.  See Nationwide

Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 202 (3d Cir. 2001); 9 U.S.C. § 2 (addressing

validity, irrevocability, and enforcement of written agreements to arbitrate).  Courts

"strong[ly] presum[e]" the parties intend to arbitrate, and doubts about whether an

issue is arbitrable generally "should be resolved in favor of arbitration."  Gay

v. CreditInform, 511 F.3d 369, 387 (3d Cir. 2007) (quoting Great W. Mortg. Corp.

v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997)).  A party resisting arbitration may rebut

the presumption with "positive assurance that the arbitration clause is not

susceptible of an interpretation that covers the asserted dispute."  See Lenox Corp.

v. Blackshear, 226 F. Supp. 3d 421, 432 (E.D. Pa. 2016) (quoting AT&T Techs., Inc.

v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)).  To that end, the party must

demonstrate the "existence of an express provision excluding [the] grievance from

arbitration" or provide "the most forceful evidence of a purpose to exclude the

claim from arbitration."  See Lukens Steel Co. v. United Steelworkers of Am. (AFL-

CIO), 989 F.2d 668, 673 (3d Cir. 1993) (quoting AT&T Techs., 475 U.S. at 650).

West Shore does not dispute the validity of the arbitration clause within

Graeser's employment agreement.  (See Doc. 17 at 15).  The sole issue before us is

whether the agreement's compulsory arbitration provision subsumes the dispute

over Graeser's alleged disclosure of confidential information.  We find it does not.

Graeser relies exclusively upon the portion of the agreement in which the parties

"accept[] the use of arbitration" and agree to "giv[e] up their constitutional right to

have *any dispute* decided in a court of law before a jury."  (See Doc. 11 at 2 (quoting

Doc. 9-1 at 7) (emphasis modified)).  But that provision is limited by the terms of the

very next paragraph, which unambiguously exempt from arbitration "*any* non-

solicitation or non-disclosure provisions, rights, and legal remedies contained elsewhere in this agreement." (<u>See</u> Doc. 9-1 at 7 (emphasis modified)).

Graeser argues the exclusionary clause implicitly refers only to actions for injunctive relief, not those for money damages. (<u>See</u> Doc. 28 at 3-4). He highlights the clause's prefatory language, which refers to the possibility of "immediate and irreparable harm from a violation of the restrictive covenant sections of this agreement," in support of his limiting construction. (<u>See</u> <u>id.</u> at 4 (quoting Doc. 9-1 at 7 (emphasis omitted))). The clause contains no such limitations, and we decline to read them into it. *Per contra*, the clause expressly exempts *any* nondisclosure provision from arbitration, and the relevant provision covered by the exclusion plainly authorizes West Shore to seek injunctive relief "*in addition to* any other legal remedies that may be available" in the event of a breach. (<u>See</u> Doc. 9-1 at 3 (emphasis added)). This action falls within the nondisclosure provision's broad ambit and therefore is exempt from compulsory arbitration. Graeser's motion to compel arbitration fails.

### 2.   *Consideration*

Under Pennsylvania law, a plaintiff must plead three elements to establish a cause of action for breach of contract or, pertinent here, breach of a restrictive covenant contained in a contract: (1) existence of a contract or covenant, including its essential terms, (2) breach, and (3) resultant damages. <u>See</u> <u>Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.</u>, 137 A.3d 1247, 1258 (Pa. 2016). It is hornbook law in the Commonwealth that a contract requires mutual understanding between the parties, exchange of consideration, and

delineation of terms with sufficient clarity.  See Weavertown Trans. Leasing, Inc.
v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).  Graeser suggests the second
component of a valid contract is lacking; he argues the restrictive covenants in his
employment agreement were unsupported by adequate consideration when he
acceded to them, and thus West Shore's claim should be stricken under the rule of
Socko v. Mid-Atlantic Systems of CPA, Inc., 126 A.3d 1266 (Pa. 2015).  (See Doc. 11
at 7-8).

Restrictive covenants come in many flavors, the most common of which are
the triumvirate of nondisclosure, noncompetition, and nonsolicitation agreements.
See Hess v. Gebhard & Co. Inc., 808 A.2d 912, 917 (Pa. 2002); cf. Pittsburgh Logistics
Sys., Inc. v. Beemac Trucking, LLC, 249 A.3d 918 (Pa. 2021) (addressing
nonsolicitation and "no hire, or 'no poach'" agreements in services contract
between business entities).  Employers often will require employees to sign
confidentiality and noncompete agreements as a condition of employment "to
shield their protectible business interests."  See Hess, 808 A.2d at 917.  "The non-
disclosure covenant limits the dissemination of proprietary information by a former
employee, while the non-competition covenant precludes the former employee from
competing with his prior employer for a specified period of time and within a
precise geographic area."  Id.  Certain restrictive covenants, although in popular
use today, historically have been disfavored in the Commonwealth as "trade
restraint[s] that prevent[] a former employee from earning a living."  See id. (citing
Jacobson & Co. v. Int'l Env't Corp., 235 A.2d 612 (Pa. 1967)).

The Supreme Court of Pennsylvania, in Socko, reiterated the longstanding rule that restrictive covenants are enforceable in the Commonwealth "only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) . . . reasonably limited in duration and geographic extent; and (4) . . . designed to protect the legitimate interests of the employer."  See Socko, 126 A.3d at 1275 (citations omitted); see also Rullex Co., LLC v. Tel-Stream, Inc., 232 A.3d 620, 624-25 (Pa. 2020).  Restrictions imposed after an employee begins working—often referred to as "post-employment" agreements, see Hess, 808 A.2d at 918—are enforceable only if supported by "new and valuable consideration," see Socko, 126 A.3d at 1275 (citing Pulse Techs., Inc. v. Notaro, 67 A.3d 778, 781-82 (Pa. 2013); Maint. Specialties, Inc. v. Gottus, 314 A.2d 279, 281 (Pa. 1974)).  Generally speaking, "mere continuation of the employment relationship" will not suffice.  See id.  But not all restrictive covenants are created equal.

In 1955, a group of door-to-door salesmen were required to sign nondisclosure, noncompete, and nonsolicitation agreements to continue working for Morgan's Home Equipment Corporation, a home furnishing company, one month after the company had taken over their former employer.  See Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 841, 845 n.13 (Pa. 1957).  The agreements identified as consideration the employees' continued employment with the successor company and "contained the language: 'I intend to be legally bound hereby.'"  See id.  Morgan's sued the salesmen for breach of contract, alleging violations of the restrictive covenants.  See id.  The trial court declared the

covenants unenforceable for lack of consideration, but the *en banc* court reversed the decision and enforced the agreements.  See <u>id.</u> at 841-42.  On appeal, the state supreme court ignored the salesmen's assertions of inadequate consideration and the trial court's initial finding in that regard with respect to the confidentiality covenant.  See <u>id.</u> at 842-43.  The court deemed that provision to be enforceable irrespective of any potential consideration deficiencies.  See <u>id.</u> at 843.  It did so implicitly in recognition of the common law.  See <u>id.</u> (citing <u>Macbeth-Evans Glass Co. v. Schnelbach</u>, 86 A. 688 (Pa. 1913); <u>Belmont Labs. v. Heist</u>, 151 A. 15 (Pa. 1930)).  Courts in equity would "restrain an employé from making disclosures or use of trade secrets communicated to him in course of a confidential employment," whether the employee's duty arose from an express contract or was inferred from the employer-employee relationship.  See <u>Macbeth-Evans</u>, 86 A. at 690-91.  Those principles vitiated the salesmen's affirmative defense.[1]

The Superior Court of Pennsylvania touched on the unique nature of confidentiality agreements in <u>Bell Fuel Corp. v. Cattolico</u>, 544 A.2d 450 (Pa. Super. Ct. 1988).  A former employee challenged the "sweeping" nondisclosure and return-of-records covenants to which he had agreed as facially unreasonable because they lacked territorial or temporal limitations.  See <u>Bell Fuel Corp.</u>, 544 A.2d at 457-58.

---

[1] The court addressed consideration with respect to the noncompete and nonsolicitation provisions, however, and found it adequate because the salesmen "were retained on a provisional basis" before being offered regular employment. See <u>Morgan's Home Equip.</u>, 136 A.2d at 845-46 & nn.13-14; <u>cf.</u> <u>George W. Kisler, Inc. v. O'Brien</u>, 347 A.2d 311, 316 & n.5 (Pa. 1975) (continued employment plus nominal ($1.00) consideration insufficient for noncompete covenant).

The court rejected his argument out of hand: the confidentiality requirements were "not subject to the reasonableness standard" applicable to noncompete covenants. See id. at 458; see also Alturnamats, Inc. v. Harry, No. 07-337, 2009 WL 185952, at *3 (W.D. Pa. Jan. 23, 2009) ("[W]here an agreement simply restricts the use of confidential information and is not a non-compete agreement, the relief bargained for by the parties in the agreement generally will be enforced.").  Employers are entitled to protect their confidential information to the extent it "is of such a character as to be protectible under the common law of unfair competition or agency." Bell Fuel Corp., 544 A.2d at 458 (citing Spring Steels, Inc. v. Molloy, 162 A.2d 370 (Pa. 1960); Morgan's Home Equip., 136 A.2d 838); see also id. at 458 n.5. The employer's "legal right to protection may arise either from an express covenant . . . or may be implied from the confidential relationship between" the parties "in which the information was conveyed." See id. at 460 (citing MacBeth-Evans, 86 A. 688; Felmlee v. Lockett, 351 A.2d 273 (Pa. 1976)).

We recently relied upon Bell Fuel Corporation and the authority cited therein to further distinguish the enforceability requirements for noncompete and nonsolicitation covenants from those applicable to nondisclosure provisions in the employment context.  See Graham Eng'g Corp. v. Adair, No. 1:16-CV-2521, 2021 WL 9204331, at *8-9 (M.D. Pa. Feb. 10, 2021) (Conner, J.).  Graham Engineering Corporation extended employment offers to several employees of a rival company in preparation for acquiring it.  See id. at *1.  Four employees accepted short-term employment with Graham and signed new contracts.  See id.  Three did not, but remained subject to the terms of previously signed employment agreements with

the competitor, including post-employment restrictive covenants.  See id.  Within a few months, none of the seven still worked for Graham, who eventually sued them all for breach of contract and related claims after they formed a competing entity. See id. at *1, 4.  Two defendants who had not accepted employment with Graham sought summary judgment, arguing insufficient consideration.  See id. at *8. Graham did not dispute the noncompete and nonsolicitation provisions were unenforceable: both employees "received only 'continued employment' rather than 'fresh consideration' for signing their employment agreements."  See id. at *9.  We agreed.  In upholding the confidentiality clauses, however, we reasoned that "continued employment is sufficient consideration" based upon distinctions the Commonwealth's courts historically have drawn between discrete nondisclosure agreements and noncompete or nonsolicitation covenants.  See id. (citing Bell Fuel Corp., 544 A.2d at 458).  We reaffirm that conclusion today.

The Supreme Court of Pennsylvania has not entertained a challenge to a standalone nondisclosure covenant in an employment matter since it decided Socko more than seven years ago.  See, e.g., Rullex, 232 A.3d at 449 (addressing noncompete "facet" of master service agreement but not nondisclosure aspect).  To the extent the Commonwealth's intermediate appellate courts have addressed consideration for restrictive covenants in employment matters, those cases invariably have focused upon the enforceability of noncompete or nonsolicitation agreements, even when a confidentiality clause is present.  See, e.g., Amquip Crane Rental, LLC v. Crane & Rig Servs., LLC, 199 A.3d 904, 917-18 (Pa. Super. Ct. 2018); Metalico Pittsburgh, Inc. v. Newman, 160 A.3d 205, 211-14 (Pa. Super. Ct. 2017); USI

<u>Ins. Servs. Nat'l, Inc. v. Frieman</u>, 273 A.3d 1039, 2022 WL 390662, at *8-10 (Pa. Super. Ct. Feb. 9, 2022) (unpublished table decision); <u>Nordon, LLC v. Schlisman</u>, 258 A.3d 554, 2021 WL 2652667, at *6-8 (Pa. Super. Ct. June 28, 2021) (unpublished table decision); <u>McCarl's Servs., Inc. v. Dargenzio</u>, 249 A.3d 1183, 2021 WL 733557, at *9-11 (Pa. Super. Ct. Feb. 25, 2021) (unpublished table decision).

We have canvassed the universe of federal decisions citing the rule of <u>Socko</u> as well.  Among the handful of cases testing employment agreements at the motion to dismiss or summary judgment stage, most have addressed the adequacy of consideration for restrictive covenants generally, without distinguishing confidentiality requirements.  <u>See, e.g.</u>, <u>Liberty Mut. Ins. Co. v. Gemma</u>, 301 F. Supp. 3d 523, 534-35 (W.D. Pa. 2018) (plaintiff alleged adequate consideration for all restrictive covenants in post-employment agreement in form of bonus compensation plan); <u>Rago v. Trifecta Techs., Inc.</u>, No. 5:22-CV-1482, 2022 WL 2916688, at *1-4 (E.D. Pa. July 25, 2022) (plaintiff alleged sufficient facts regarding consideration for noncompetition agreement containing "several restrictive covenants"); <u>Schuylkill Valley Sports, Inc. v. Corp. Images Co.</u>, No. 5:20-CV-2332, 2020 WL 3167636, at *7-8 & n.11, *14 (E.D. Pa. June 15, 2020) (declining to offer opinion as to adequacy of consideration upon finding restrictive covenants unenforceable for other reasons); <u>but see</u> <u>Wurth Baer Supply Co. v. Strouse</u>, ___ F. Supp. 3d ___, No. 4:21-CV-1913, 2022 WL 4125082, at *8-9 (M.D. Pa. Sept. 9, 2022) (denying motion to dismiss predicated upon failure to plead consideration for standalone confidentiality agreement when signing was condition of employment).

We have identified just two instances within this circuit in which a district court dismissed a breach of contract claim for failure to plead adequate consideration for a restrictive employment covenant.  See Ricoh USA, Inc. v. Bailon, 419 F. Supp. 3d 871, 876-77 (E.D. Pa. 2019) (plaintiff failed to plausibly allege new and valuable consideration for post-employment agreement containing various covenants where agreement "arguably contradicts" complaint's "conspicuously vague" allegations); Asset Plan. Servs., LTD. v. Halvorsen, No. 21-2021, 2022 WL 1104060, at *5-6 (E.D. Pa. Apr. 13, 2022) (complaint "glaringly silent" about whether consideration issued for nondisclosure provision in employment contract; continued employment insufficient for separate confidentiality agreement).  These decisions provide minimal support for Graeser.  Neither court confronted the bevy of Pennsylvania precedent discussed above, and the complaints in both cases suffered from patent deficiencies or contradictions not present here.

In light of our survey of authority, we find West Shore has met the pleading requirements of an enforceable contract regarding Graeser's confidentiality obligations.  West Shore avers Graeser executed an employment agreement "[i]n recognition of his access to" the company's confidential and trade-secret information.  (See Doc. 9 ¶ 23).  The opening lines of the agreement further acknowledge Graeser's "desires" to work for West Shore and its successors, the parties' mutual promises, and their exchange of "other good and valuable consideration."  (See Doc. 9-1 at 1); cf. Harrisburg Auth. v. CIT Capital USA, Inc., 869 F. Supp. 2d 578, 598 (M.D. Pa. 2012) (finding statement "for other good and

valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties agree" sufficiently binding substitute for consideration). Nothing more is needed to substantiate the enforceability of Graeser's nondisclosure covenant at this stage. Graeser's alternative challenge therefore fails.

### B.   Fitzpatrick's Motion to Dismiss for Failure to State a Claim

West Shore alleges Fitzpatrick misappropriated its trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act ("PUTSA"), 12 PA. CONS. STAT. § 5301 *et seq.*, and the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831 *et seq.*, (Counts V and VI, respectively), and tortiously interfered with the company's contractual relations with Graeser and Penn (Counts IV and VIII, respectively). (See Doc. 9 ¶¶ 104-51, 161-69).

#### 1.   *Misappropriation of Trade Secrets (Counts V and VI)*

PUTSA and the DTSA prohibit misappropriation of "trade secrets," which broadly includes a variety of information, such as patterns, plans, compilations, formulas, methods, and processes. See 18 U.S.C. §§ 1836(b)(1), 1839(3)(A)-(B); 12 PA. CONS. STAT. §§ 5302-04. Courts evaluate several factors in deciding whether information is a trade secret, including:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010) (citing Crum v. Bridgestone/Firestone N. Am. Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006)). A plaintiff "need not describe [the alleged] trade secrets with particularity to survive Rule 12 scrutiny." See Magnesita Refractories Co. v. Tianjin New Century Refractories Co., Ltd., No. 1:17-CV-1587, 2019 WL 1003623, at *9 (M.D. Pa. Feb. 28, 2019) (Conner, C.J.) (collecting cases). Indeed, requiring detailed descriptions of misappropriated information at the pleading stage would be nonsensical, insofar as it "would result in public disclosure of the purported trade secret." See id. (quoting Mattern & Assocs., LLC v. Latham & Watkins LLP, No. 13-6592, 2014 WL 4804068, at *3 (E.D. Pa. Sept. 26, 2014)).

To avoid dismissal, a plaintiff invoking either statute need only allege the defendant "misappropriated" a trade secret; the trade secret "derives independent economic value" by virtue of its secrecy, would be valuable to others, and is not otherwise "readily ascertainable through proper means"; and its owner has taken "reasonable measures" to keep it secret. See Air Dynamics Indus. Sys., Inc. v. Lehman, No. 1:19-CV-2073, 2020 WL 6544966, at *7 (M.D. Pa. Nov. 6, 2020) (Conner, J.) (quoting 18 U.S.C. § 1839(3)(A)-(B)). Both statutes supply dual definitions for "misappropriation." The first simply covers "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." See 18 U.S.C. § 1839(5)(A); 12 PA. CONS. STAT. § 5302. The second, multifactorial definition includes the "disclosure or use of a trade secret of another without express or implied consent" by someone who (i) used improper means to acquire knowledge of it, (ii) knew or had reason to know

at the time of disclosure or use that their knowledge was derived via someone who acquired the trade secret by improper means or under circumstances evincing a duty to maintain its secrecy, or (iii) knew or had reason to know it was a trade secret and that they had acquired it by accident or mistake before experiencing a material change of position.  See 18 U.S.C. § 1839(5)(B); 12 PA. CONS. STAT. § 5302.

### a.  Protected Trade Secrets

West Shore's amended complaint identifies the methods and processes that constitute its trade secrets, as contained in the three documents Graeser forwarded from his work email account and the confidential information to which he referred in the email chain dated January 4, 2022.  The company describes its warehouse distribution plan as a document specifically created by a third party at West Shore's request "to optimize its performance and assist with the planning for West Shore's strategic growth." (See Doc. 9 ¶ 40).  This document identifies target locations nationwide for West Shore's prospective product warehouses and distribution centers, none of which would have been publicly known. (See id. ¶¶ 41-42).  It is reasonable to infer West Shore's competitors in the home-renovation industry would benefit from inside knowledge of the company's private strategies for cornering the market and might seek to undermine those efforts with preemptive expansions to target locations.

The spreadsheet detailing the tools with which West Shore would outfit its installation trucks likewise facially satisfies general pleading requirements for trade secrets under the circumstances.  West Shore characterizes the document as a comprehensive inventory of product numbers, costs, and quantities of tools. (See

id. ¶¶ 44-45; see also Doc. 9-3 at 2).  We do not doubt Fitzpatrick's suggestion that the price or product number of a given tool is publicly available information.  (See Doc. 14 at 9).  But that is neither here nor there.  The specific type, quantity, and combination of "all tools maintained in West Shore's installation trucks" necessarily is unique to its business and not publicly known or readily available.  (See Doc. 9 ¶ 45).  Whatever advantage West Shore might derive from customizing its vehicles and outfitting them in this manner could be undermined if competitors may freely copy its confidential plan.

The email containing proprietary price information from a West Shore vendor included terms specifically negotiated by the company.  (See id. ¶ 47).  Should a competitor discover that information, it could undercut West Shore by negotiating a more favorable rate or poison the well altogether by strategically disclosing the company's future sourcing strategies.  West Shore avers at least one of its vendors that also supplied Fitzpatrick discontinued supplying West Shore's branches in March 2022, forcing it to procure critical materials at greater costs from other sources.  (See Doc. 9 ¶¶ 61-63).  Lastly, while working for Fitzpatrick, Graeser emailed a West Shore vendor to discuss "historical data" and "sales trends" directly culled from West Shore's confidential sales and customer preferences records.  (See id. ¶¶ 49-52).  Graeser also mentioned West Shore's strategic purchasing methods while contemplating developing the same for Fitzpatrick, and he referenced confidential information about specific vendors' capabilities.  (See id. ¶¶ 53-54).

Applying the six factors enumerated *supra*, see Bimbo Bakeries, 613 F.3d at 109, we conclude West Shore adequately has pled that the information contained in

Graeser's emails constitute trade secrets.  The information was not generally known outside of West Shore's business; to the extent it was shared internally among management, it was on a need-to-know basis.  (See Doc. 9 ¶¶ 115, 135).  The company identified two external entities who had access to certain documents, but those limited disclosures came about through a confidential consulting relationship (the warehouse plan) and private negotiations (the vendor agreement).  (See id. ¶¶ 40, 47).  Purposefully disclosing confidential information attendant to such arrangements does not extinguish their protections as trade secrets.  See Nova Chems., Inc. v. Sekisui Plastics Co., Ltd., 579 F.3d 319, 327-28 (3d Cir. 2009); see also ISC-Bunker Ramo Corp. v. Altech, Inc., 765 F. Supp. 1310, 1334 (N.D. Ill. 1990) ("partial disclosures to third parties who are under obligations of confidentiality do not alter . . . trade secret status"); accord Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 664 (4th Cir. 1993).

West Shore claims it "invested substantial time, effort, and money" to acquire and develop its confidential information and trade secrets.  (See Doc. 9 ¶ 116).  Though it does not put a specific dollar value on, or identify its development costs in acquiring, the information, West Shore surely expended some resources in hiring a third party to create its warehouse distribution plan and in compiling the inventory for its installation trucks.  (See id. ¶¶ 40, 45).  Furthermore, the information arguably is more than *de minimis* value to West Shore's competitors. The warehouse distribution plan contains "highly confidential and proprietary information" and identifies the locations West Shore intends to target to acquire more market share in the highly competitive home remodeling industry.  (See id.

¶¶ 42-43).  The tool spreadsheet reveals West Shore's entire inventory and effectively serves as a blueprint for customizing installation trucks.  (See id. ¶ 45). West Shore negotiated a unique vendor pricing agreement, which we can infer is more advantageous than the vendor's public-facing prices.  (See id. ¶ 47).

Graeser's retention of West Shore's "historical data," "sales trends," vendor capabilities, and "strategic methods of purchasing" likely gave Fitzpatrick a leg up in developing its own methods and strategies, which was Graeser's stated intention. (See id. ¶¶ 51-54).  Any of this information, on its own, could be valuable to Fitzpatrick; taken together, these materials provide unparalleled insight into its rival's business.  Other courts have deemed comparable information to be entitled to trade-secret protections.  See, e.g., SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1257, 1260 (3d Cir. 1985); Le Tote Inc. v. Urb. Outfitters, Inc., No 20-3009, 2021 WL 2588958, at *2 (E.D. Pa. June 24, 2021); Mallet & Co. v. Lacayo, No. 19-1409, 2020 WL 6866386, at *7 (W.D. Pa. Nov. 23, 2020); Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2012 WL 4205476, at *27-28 (E.D. Pa. Sept. 19, 2012); Air Prods. & Chems., Inc. v. Johnson, 442 A.2d 1114, 1121 (Pa. Super. Ct. 1982).  It is unlikely, given the proprietary nature of the information, Fitzpatrick or any other competitor could have acquired the same or duplicated West Shore's efforts easily or legitimately, if at all.

Moreover, West Shore took reasonable steps to protect the information before and after its disclosure.  The company password-protects confidential information and makes it accessible only to those who need it to perform their duties.  (See Doc. 9 ¶¶ 115, 135).  Employees must review and acknowledge West

26

Shore's employee handbook, which stresses safeguarding confidential information, on a yearly basis.  (See id.)  West Shore utilizes nonsolicitation and nondisclosure provisions like the ones found in Graeser's employment agreement, obliging employees not to reveal a litany of "Confidential Records and Information" they might be exposed to in the course of their employment.  (See Doc. 9-1 at 2-3). Graeser's agreement contained detailed procedures for returning or destroying confidential information upon separating from the company.  (See id. at 3).  If Graeser could not reasonably deliver up any confidential information to West Shore, he was required to "provide reasonable evidence that such materials have been destroyed."  (See id.)  West Shore also provided Graeser and other employees company email addresses with which to contact vendors, customers, and the like, while banning them from downloading confidential materials onto personal devices. (See Doc. 9 ¶ 115).  West Shore can monitor company email accounts to investigate potential breaches of the confidentiality policy, as demonstrated by efforts it took to secure its trade secrets when a vendor mistakenly emailed Graeser's old address after he resigned.  (See id. ¶ 49).  Upon discovering Graeser's emails, West Shore promptly acted to prevent further disclosures by sending cease-and-desist letters to him and to Fitzpatrick.  (See id. ¶¶ 55, 59).  For all these reasons, Fitzpatrick's challenge to the information at issue constituting "trade secrets" is meritless.

### b.   Misappropriation

Fitzpatrick argues West Shore's resort to generalized claims "upon information and belief" is insufficient as a matter of law to plead it misappropriated West Shore's trade secrets; in its view, the amended complaint contains "no specific

allegations" about how it improperly used or disclosed any trade secrets.  (See Doc. 14 at 10).  To the contrary, our court of appeals permits pleading "upon information and belief" if "it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control."  See McDermott v. Clondalkin Grp., Inc., 649 F. App'x 263, 267-68 (3d Cir. 2016) (nonprecedential) (quoting In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002)).  Without discovery on a defendant's operations, a plaintiff "may have no way of knowing what trade secrets have been misappropriated."  See PDC Machs. Inc. v. Nel Hydrogen A/S, No. 17-5399, 2018 WL 3008531, at *3 (E.D. Pa. June 15, 2018) (citing DeRubeis v. Witten Techs., Inc., 244 F.R.D. 676, 680 (N.D. Ga. 2007)).  As long as plaintiffs "accompany their legal theory with factual allegations that make their theoretically viable claim plausible," their claims may survive the motion to dismiss stage; as always, "boilerplate and conclusory allegations will not suffice."  See In re Rockefeller Ctr., 311 F.3d at 216 (emphasis omitted) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).

West Shore has amply met its burden.  The company alleges Graeser took its trade secrets for Fitzpatrick's benefit.  (See Doc. 9 ¶ 60).  The requisite facts needed to substantiate West Shore's allegation are "peculiarly within" Fitzpatrick's "knowledge and control."  See In re Rockefeller Ctr., 311 F.3d at 216.  As a newly minted Fitzpatrick employee, Graeser communicated with a known West Shore vendor about "historical data," "sales trends," and vendor capabilities—information he obtained through his former employer.  (See id. ¶¶ 49-52, 54).  He also referenced West Shore's strategic purchasing methods when discussing developing similar

methods for Fitzpatrick.  (See id. ¶ 53).  If the purpose of Graeser's disclosures was to curry favor with a prospective vendor, as West Shore alleges, (see id. ¶ 64), it is reasonable to think success in that regard would redound to Fitzpatrick's benefit and West Shore's detriment, see Fres-co Sys. USA, Inc. v. Hawkins, 690 F. App'x 72, 76 (3d Cir. 2017) (nonprecedential) (inferring former employee would likely use confidential knowledge for competitor's benefit and former employer's detriment given "substantial overlap" in role, industry, and geographic region); Jazz Pharms., Inc. v. Synchrony Grp., LLC, 343 F. Supp. 3d 434, 446 (E.D. Pa. Dec. 3, 2018) (same). The same can be said of coopting a competitor's strategic purchasing methods. There is no reason to think Graeser undertook these efforts solely with his own pecuniary interests in mind, as opposed to with Fitzpatrick's blessing or at its direction.

West Shore raises more than boilerplate, conclusory allegations, and thus pleads a *prima facie* claim for misappropriation of trade secrets under PUTSA and the DTSA.

### 2.    *Tortious Interference (Counts IV and VIII)*

To prevail on a claim of tortious interference under Pennsylvania law, a plaintiff must plead

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct[.]

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009); see also Glenn v. Point Park Coll., 272 A.2d 895, 898 (Pa. 1971).  As a preliminary matter, Fitzpatrick seeks dismissal of both tortious interference claims, but only contests the merits of the claim relating to Graeser (Count IV).  (See Doc. 14 at 10-12).  To the extent Fitzpatrick also seeks dismissal of the claim involving Penn (Count VIII), (see Doc. 14 at 12), that argument is waived for lack of development, see Pa. State Troopers Ass'n v. Pawlowski, No. 1:09-CV-1748, 2011 WL 5839564, at *1 (M.D. Pa. Nov. 21, 2011) (citing Conroy v. Leone, 316 F. App'x 140, 144 n.5 (3d Cir. 2009) (nonprecedential)).

With respect to Graeser, Fitzpatrick challenges West Shore's supposed failure to draw a connection between Fitzpatrick's business and the three emails Graeser forwarded to himself.  (See Doc. 14 at 11).  West Shore's allegations are purely speculative in defendant's view: Fitzpatrick did not encourage Graeser to forward the emails, and Graeser did not share them with Fitzpatrick.  (See id. at 11-12).  This argument fails for the reasons stated in the preceding section.  See supra pp. 28-29.  West Shore adequately has alleged Fitzpatrick directed, or at the very least acquiesced in, Graeser's improper use of West Shore's trade secrets in violation of his employment agreement, and that Fitzpatrick did so without justification.  (See Doc. 9 ¶¶ 60, 65).  Even if Graeser did not share the emails with representatives of his new employer, he referenced West Shore's trade secrets while communicating with vendors on Fitzpatrick's behalf.  (See id. ¶¶ 49-52, 54).  He also discussed developing strategic methods for Fitzpatrick, a task unlikely to be undertaken without his employer's knowledge or permission.  (See id. ¶ 53).

Drawing all inferences in plaintiff's favor, West Shore may have suffered concrete harm as a result: it lost a client vendor soon after discovering Graeser's emails and had to pay more to source its materials elsewhere.  (See id. ¶¶ 61-64).  That is enough to defeat Fitzpatrick's motion to dismiss the claim of tortious interference.

### C.      Penn's Motion to Dismiss for Lack of Jurisdiction

Penn calls into question our exercise of supplemental jurisdiction over the lone breach-of-contract claim against him.  (See Doc. 21-1 at 7-10).  In the alternative, he argues West Shore has failed to state a claim for breach of contract.  (See id. at 10-12).  We agree jurisdiction is lacking under these circumstances, and therefore do not reach the merits of Penn's basis for dismissal.  See Goudy-Bachman v. U.S. Dep't of Health & Hum. Servs., 764 F. Supp. 2d 684, 689 (M.D. Pa. 2011) (Conner, J.) (citation omitted).

Congress has authorized federal district courts to exercise supplemental jurisdiction, "in any civil action of which the district courts have original jurisdiction, . . . over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  See 28 U.S.C. § 1367(a).  This includes claims involving the joinder or intervention of other parties.  See id.  We may decline to exercise supplemental jurisdiction over pendant or ancillary claims if (1) they involve novel or complex issues of state law, (2) they substantially predominate over the claims within the court's original jurisdiction, (3) the court has dismissed all claims within its original jurisdiction, or (4) other compelling reasons justify declining jurisdiction in exceptional circumstances.  Id. § 1367(c).

Whether West Shore's claim against Penn is "so related to" the claims within our original jurisdiction that it "form[s] part of the same case or controversy," see id. § 1367(a), is a threshold question.  The Supreme Court of the United States sought to simplify the relevant inquiry in United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966), its seminal decision on this subject.  Gibbs set forth three requirements for exercising supplemental jurisdiction.  See Lyon v. Whisman, 45 F.3d 758, 760 (3d Cir. 1995).  First, the federal claim must sufficiently "confer subject matter jurisdiction on the court."  Id. (quoting Gibbs, 383 U.S. at 725).  Second, "[t]he state and federal claims must derive from a common nucleus of operative fact."  Gibbs, 383 U.S. at 725.  We do not require "total congruity between the operative facts" to satisfy the first requirement, but a "mere tangential overlap of facts" is not enough.  See Nanavati v. Burdette Tomlin Mem. Hosp., 857 F.2d 96, 105 (3d Cir. 1988).  Finally, regardless of the character of the federal or state claims, they must be of a kind that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding."  Gibbs, 383 U.S. at 725.  Only when all three requirements are met will we have authority "to hear the whole."  See id.; see also Lyon, 45 F.2d at 760 n.4 (courts retain discretion to decline to hear supplemental claims pursuant to Section 1367(c)).

Penn does not dispute West Shore meets the first prong of the tripartite Gibbs test.  (See Doc. 21-1 at 8).  We have original jurisdiction over the company's DTSA claims against Graeser and Fitzpatrick because they raise a federal question. See 28 U.S.C. § 1331.  Penn challenges West Shore's ability to satisfy the test's

remaining requirements.  (See Doc. 21-1 at 8-10).  We find West Shore's case deficient in both instances.

West Shore's action against Penn exhibits none of the characteristics our court of appeals has indicated would push a plaintiff's pendent state-law claims firmly over "[t]he line that separates" viable Article III cases from nonviable ones. See Lyon, 45 F.3d at 761.  For instance, West Shore does not allege Penn's actions transgressed "parallel federal and state laws," in which case "the common nucleus of operative facts is obvious" and our exercise of supplemental jurisdiction would be considered "routine[]."  See id.  Nor do West Shore's state and federal claims "merely" constitute "alternative theories of recovery based on the same acts."  See id. (quoting Lentino v. Fringe Emp. Plans, Inc., 611 F.2d 474, 479 (3d Cir. 1979)). West Shore does not even allege "a critical background fact" we might charitably regard as "common to all claims."  See Nanavati, 857 F.2d at 105 (citing Ambromovage v. United Mine Workers of Am., 726 F.2d 972, 992 (3d Cir. 1984) (district court had supplemental jurisdiction to consider defendant's state-law counterclaim because key factual question "implicate[d] the entire factual matrix")). The gravamen of West Shore's case is Graeser and Fitzpatrick's alleged misappropriation of its trade secrets.  West Shore does not suggest Penn had any role in that enterprise whatsoever.  The lone claim against him is that he breached

the nonsolicitation clause of his employment agreement.  (<u>See</u> Doc. 9 ¶¶ 152-160).[2]

West Shore's amended complaint draws no meaningful connection between Penn

and Graeser, save for the fact they overlapped at West Shore from April 2019 to

November 2021 and now work for Fitzpatrick.  (<u>See</u> <u>id.</u> ¶¶ 20, 26-30, 37, 66).  They

held different positions, exercised different responsibilities, handled different

confidential materials, and left West Shore under different circumstances.  (<u>See</u> <u>id.</u>

¶¶ 21-23, 26, 30-32).

Penn's sole connection to this case stems from a photograph and brief text

message West Shore claims he sent to 16 former coworkers, urging them to jump

ship and go work for Fitzpatrick.  (<u>See</u> <u>id.</u> ¶¶ 67-69, 152-160).  In no way do these

sparse allegations derive from the common nucleus of operative facts comprising

West Shore's federal claims against Fitzpatrick and Graeser.  If anything, they are

the factual nucleus of a different atom.  We would not ordinarily expect a plaintiff to

try in the same judicial proceedings a state-law claim involving a peripheral

defendant with no relation to the principal action.  <u>See</u> <u>Gibbs</u>, 383 U.S. at 725.  That

is Penn's station in these proceedings.  Accordingly, West Shore may not bootstrap

its breach-of-contract claim against him to secure our jurisdiction.

---

[2] West Shore also intimated Penn breached his employment agreement by retaining its trade secrets and disclosing them to Fitzpatrick "and/or us[ing them] in his work" there.  (<u>See</u> Doc. 9 ¶ 157).  But the amended complaint contains no facts to support those bald allegations, and West Shore now concedes it "does not at this time allege that Penn has misappropriated [its] trade secrets."  (<u>See</u> Doc. 25 at 17).

**IV.**    <u>**Conclusion**</u>

We will grant Penn's motion and deny Graeser's and Fitzpatrick's motions.

An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 14, 2023